AMERICAN SATELLITE
COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 525–89C.

United States Claims Court.

June 26, 1990.

Caryl A. Potter, III, Washington, D.C., for plaintiff. Kenneth J. Wees and Elizabeth A. Ferrell, Washington, D.C., of counsel.

Brian A. Mizoguchi, Washington, D.C., with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, for defendant. June W. Edwards, Nat. Aeronautics Space Admin., of counsel.

## OPINION

BRUGGINK, Judge.

Pending is defendant's motion pursuant to RUSCC 12(b)(4) to dismiss the complaint for failure to state a claim. For the reasons stated, the motion is granted as to Count I, and denied as to other counts.

### I.  FACTUAL BACKGROUND [1]

American Satellite Company (now doing business under the name "Contel ASC") and the United States, acting through the National Aeronautics and Space Administration ("NASA"), entered into Launch Services Agreement No. 1306–002 ("LSA"), effective August 3, 1984. Under the LSA, NASA agreed to launch two telecommunications satellites (ASC–1 and ASC–2) for Contel ASC utilizing the Shuttle on "Shared Shuttle Flights." Under the terms of the LSA, the agreement was to

---

[1].  The facts are drawn from plaintiff's complaint and attachments. Defendant attached three documents to its motion to dismiss. At oral argument, defendant withdrew its reliance on these documents. It is therefore unnecessary to consider treating the motion as one for summary judgment. RUSCC 12(b)(4).

remain in force for twelve years following the first operational Shuttle launch or until all obligations under the agreement were fulfilled.

Pursuant to its obligations under the LSA, NASA launched ASC–1 on August 27, 1985. ASC–1 is not at issue in this dispute. NASA scheduled a "Firm Launch Date" of January 27, 1987 for ASC–2, planning to use the Shuttle. The cost to ASC of a January 27, 1987 Shuttle launch for ASC–2 would have been $26,838,000 (excluding the cost of the ASC–2).

Shuttle flight 51–L (Challenger) was destroyed on January 28, 1986. The apparent cause was a faulty design in the Morton Thiokol solid propellant booster rockets. Plaintiff contends that on August 19, 1985, at NASA headquarters, Morton Thiokol presented information about the faulty design of the solid propellant booster rockets. The complaint further asserts that as of January 28, 1986, NASA had not required any changes in the design of the solid propellant booster rockets, and that NASA had not informed the public or Contel ASC of the possible faulty design of the solid propellant booster rockets.

On September 25, 1986, the President of the United States directed NASA to discontinue launching commercial satellites on the Shuttle, other than satellites which were "Shuttle unique" or had "national security or foreign policy" implications. Prior to the President's announcement on September 25, 1986, NASA had planned to honor the LSA launch obligation to Contel ASC. In a letter dated June 3, 1986, NASA earlier had advised Contel ASC that ASC–2 had a new launch date of December 1989.

Pursuant to the President's September 25, 1986 directive to NASA, the President's Economic Policy Council ("EPC") made the decisions as to which commercial satellites would be launched by the Shuttle. The EPC was an advisory group established by the President in 1985. Membership was drawn primarily from cabinet officials. A NASA representative was a member of the EPC.

The EPC did not authorize NASA to launch ASC–2 on the Shuttle. The EPC developed its list of satellites which fit the "Shuttle unique" or "national security or foreign policy" criteria, without input from satellite owners such as Contel ASC. EPC guidelines for determining whether a satellite fit a particular category were not published. EPC did not announce any intentions to consider LSA's when developing a list of satellites appropriate for launch under the new policy.

The plaintiff asserts that, contemporaneously with the decision to alter the use of the Shuttle, the President and the EPC decided in 1985–1986 to promote the development of a commercial United States expendable launch vehicle ("ELV") industry to launch commercial satellites.

On October 3, 1986, NASA issued a formal post-Challenger Shuttle launch schedule and implemented the EPC's determinations. No date was set for launch of ASC–2 on this schedule. On October 7, 1986, Contel ASC met with NASA to determine NASA's intentions as to ASC–2. At the meeting, NASA told Contel ASC that ASC–2 would not be launched by NASA because ASC–2 did not meet the President's requirements that a commercial satellite be "Shuttle unique" or have "national security or foreign policy implications" in order to be launched by the Shuttle.

Letters dated October 30, 1986 and November 4, 1986 from NASA advised Contel ASC that, pursuant to White House policy, ASC–2 could not be scheduled for launch, and suggested that Contel ASC terminate the LSA in order to be repaid progress payments of $8,994,844 which had already been paid towards the launch fee for ASC–2.

Contel ASC refused to terminate the LSA for the reasons NASA suggested, but rather advised, by letter of February 6, 1987, that NASA's actions constituted a breach and repudiation of the LSA, and that it was seeking an alternative launch option. Without admission of liability for the breach of the LSA, NASA repaid Contel ASC's progress payments with respect to ASC–2 on April 10, 1987.

By letter dated June 19, 1987, Contel ASC presented a claim to NASA for money damages arising from NASA's failure to launch ASC-2. Subsequent to this claim, Contel ASC pursued the matter under administrative dispute resolution provisions in accordance with the LSA. On September 28, 1988, NASA denied ASC's claim for money and advised that the administrative disputes procedures under the LSA had been exhausted. Despite this letter, the parties still tried to resolve the dispute. They executed an agreement on December 6, 1988 whereby NASA agreed to provide a new proposed launch date for ASC-2 if Contel ASC could obtain the necessary governmental determination that ASC-2 complied with the President's directive of September 25, 1986.

The Department of Defense was responsible for making the determinations as to which satellites had national security implications in order to qualify for a Shuttle launch. On January 26, 1989, Gordon A. Smith, Assistant Secretary of Defense, Command, Control, Communications and Intelligence, sent a letter to Dr. James C. Fletcher, Administrator of NASA, advising him that ASC-2 had national security implications and to classify it accordingly when processing space shuttle payloads.

NASA did not accept the January 26, 1989 letter as adequate under the December 6 agreement. In a letter dated February 21, 1989, NASA requested clarification from the Department of Defense ("DOD") that ASC-2 had "national security" implications. DOD reaffirmed that ASC-2 had "national security" implications, but stated that DOD was not "sponsoring ... a reversal of the previous presidential decision on the provision of launch services by NASA for commercial payloads, that removed the ASC-2 from the Shuttle manifest." Despite receipt of the DOD letter, NASA took no steps to provide Contel ASC with a new launch date for ASC-2 nor did NASA advise Contel ASC of any other necessary authorizations that would facilitate acquisition of a new launch date.

By letter dated July 14, 1989, Contel ASC advised NASA that the failure to provide a new proposed launch date for ASC-2 was a breach and repudiation of the December 6, 1988 agreement between the parties. NASA responded by letter on July 26, 1989 advising Contel ASC that the December 6, 1988 agreement was terminated due to Contel ASC's failure to obtain the necessary launch authorization to provide ASC-2 with a spot on the Shuttle.

Under the LSA, "all Launch and Associated Services to be furnished by NASA to customer (Contel ASC) under this Agreement shall be so furnished by NASA using its best efforts." Plaintiff asserts that NASA had access to ELV's, which it characterizes as a reasonable substitute to a Shuttle launch.

Contel ASC has now contracted with McDonnell Douglas Commercial Delta, Inc. for a 1991 launch of ASC-2 on an ELV. The cost to Contel ASC as a result of the ELV launch of ASC-2 will be at least $96,-962,000 (excluding the costs of ASC-2). In this action, Contel ASC is seeking to recover from the United States the increased costs of no less than $70,124,000 associated with the launch of ASC-2 by McDonnell Douglas instead of NASA.

## II.  DISCUSSION

■ A motion to dismiss will be denied unless it appears to a certainty that no possible set of facts could be proved to support plaintiff's claims. *Wolman v. Tose*, 467 F.2d 29, 35 (4th Cir.1972); *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Furthermore, on a motion to dismiss, the facts are to be viewed in a light most favorable to plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 422, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969). From a consideration of the complaint in light of the applicable law, it is apparent that Count I must be dismissed, but that sufficient facts are pleaded to prevent dismissal of the remaining counts.

*Count I*

The LSA provides "all Launch and Associated Services to be furnished by NASA to the Customer under this Agreement shall be so furnished by NASA using its best

efforts." Article I, p. I–1 of LSA. The agreement further states that the Shuttle, on Shared Shuttle Flights, is the vehicle to be used to launch ASC–1 and ASC–2. In Count I, plaintiff contends that NASA was negligent in failing to redesign the faulty solid propellant booster rockets or at least to notify plaintiff of the defect. Plaintiff contends that defendant, having negligently breached the best efforts clause, had a duty to provide plaintiff with a reasonable substitute vehicle to launch ASC–2. According to plaintiff, defendant had available ELV's which could reasonably substitute for a Shuttle launch, and that by failing to provide an ELV, defendant failed to assert its best efforts to perform.

■ The court notes at the outset that while it does not have jurisdiction over tort actions, *see* 28 U.S.C. § 1491(a)(1) (1982), the negligence allegation here does not preclude exercise of jurisdiction. Plaintiff is asserting damages for breach of contract, not for tortious conduct. It alleges that NASA's negligent conduct constituted a breach of a contractual obligation. A contracting party is not excused from timely performance where that party has caused the inability to perform. *National Steel and Shipbuilding Co. v. United States,* 419 F.2d 863, 897–899, 190 Ct.Cl. 247 (1969). Where a contract is breached by a party's own negligence, that party is not excused from timely performance of the contract. *Carnegie Steel Co. v. United States,* 240 U.S. 156, 164–165, 36 S.Ct. 342, 344, 60 L.Ed. 576 (1916). Thus, plaintiff alleges that defendant was obligated under the LSA to use its best efforts to launch ASC–2 despite the loss of Challenger. A reasonable substitute for the Shuttle was available to the defendant. Assuming plaintiff's statement of the facts is true, NASA had access to a number of ELV's. NASA did not choose to use an ELV to launch ASC–2. The fact that defendant's breach of its LSA obligations occurred as a result of acts or omissions that might also give rise to tort liability is no bar to this court's jurisdiction. *Juda v. United States,* 6 Cl.Ct. 441, 453 (1984). Whether these asserted facts could constitute a breach of contract depends upon the language of the LSA. If defendant had no contractual obligation to provide an ELV to launch ASC–2, the count fails on its face.

■ There is no reference anywhere in the LSA to ELV's. There is certainly no explicit obligation on the part of NASA to furnish an ELV. On the contrary, by the terms of the agreement, defendant obligated itself to use its best efforts to launch two payloads on a NASA Shuttle: "NASA shall provide, as agreed to herein, the launching on Shared Shuttle flights of two spacecraft, their respective upper stage systems and all associated property to be flown aboard the Shuttle. . . ." The term Shuttle is defined in the agreement as "the Orbiter, External Tank and Solid Rocket Boosters." Plaintiff does not contend that an ELV is a Shuttle within the agreement's terms. Rather, it argues that the Shuttle and an ELV can serve the same function, and that, when it became obvious that the Shuttle could not be used, NASA should have substituted an ELV, which plaintiff claims was available. These differing views regarding the meaning of terms in the LSA lead plaintiff to argue that the *construction* of the LSA is in dispute. Construction of a contract is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim. *Wolman v. Tose,* 467 F.2d 29, 35 (4th Cir.1972). In the instant case, plaintiff's argument is incorrect. Construction of the LSA is not in dispute. Rather, it is the interpretation of the LSA. Both parties point to the same phrase of the LSA, the "best efforts" clause, to support their arguments. When both parties to an agreement point to the written contract in support of their claims, this court must serve as an interpreter of the contract.

Interpretation of a contract is a question of law. *Tilley Constructors & Engineers, Inc. v. United States,* 15 Cl.Ct. 559, 562 (1988). The court may make an interpretation of a contract as a matter of law while deciding whether to grant defendant's motion for the court to dismiss for failure to state a claim for which relief can be granted. *Ceccanti, Inc. v. United States,* 6

Cl.Ct. 526, 528 (1984). Plaintiff's interpretation of the "best efforts" clause is unreasonable. The agreement contains no provisions referring to ELV's or any type of alternative launch hardware. The agreement is explicit in stating that launches of ASC–1 and ASC–2 will utilize the Shuttle. If parties list specific items in the contract, it can be assumed they intended to exclude other unenumerated items. *Favell v. United States*, 16 Cl.Ct. 700, 726 (1989).

It is noteworthy that the agreement itself makes allowance for the possibility that Contel ASC could request additional services through government-owned equipment (Article IX). Even assuming that NASA owned an ELV (plaintiff's counsel represented in oral argument that they were available in the private sector), the agreement requires that requests for additional services "be agreed to by NASA and ... evidenced by a formal amendment to this Agreement."

Nor is there any relevant ambiguity in the contract. Although what constitutes "best efforts" may have been less than clear at the time the agreement was signed, it is clear that defendant's obligation is to use its best efforts to perform the terms of the written agreement. It was obligated to use best efforts to make a Shuttle available, not an ELV. Thus, even assuming that plaintiff is correct that defendant acted negligently regarding Challenger, the obligation plaintiff seeks to impose was not bargained for in the LSA.

Defendant's motion to dismiss for failure to state a claim is granted as to Count I of plaintiff's complaint.

*Counts II–IV*

■ Count II of plaintiff's complaint alleges that defendant breached the launch procedures of the LSA, which require that all comparable payloads be treated similarly and that any necessary rescheduling be done in an equitable manner. Plaintiff contends that the President was not authorized under the laws of the United States to change the priority schedule where the United States was already obligated to provide launches under the terms of LSA's. By implementing the President's directives,

plaintiff charges that defendant breached the terms of the LSA.

Count III of plaintiff's complaint alleges that defendant breached the 1988 agreement between Contel ASC and the United States when defendant refused to provide ASC–2 with a new proposed launch date after plaintiff received the proper clearance called for in the new agreement.

Count IV of plaintiff's complaint alleges that Contel ASC's rights under the LSA were property rights under the Fifth Amendment, and that even assuming the President was authorized to change priority launches, such actions constitute a taking for a public purpose by the United States of Contel ASC's contract rights and therefore payment of just compensation is required.

Defendant advances one primary argument in support of its motion to dismiss all four counts. It contends that, even if the facts alleged are true, that the actions complained of are within the scope of the doctrine of "sovereign acts." Relying on cases such as *Horowitz v. United States*, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925), and *Jones v. United States*, 1 Ct.Cl. 383 (1865), the Government takes the view that there can be no liability for any possible breach of contract because the actions of the President, the EPC, and NASA are immunized as "sovereign acts performed for the general good." *Horowitz*, 267 U.S. at 461, 45 S.Ct. at 345, *quoting Jones*, 1 Ct.Cl. (1865) at 385. The United States, under this doctrine, cannot be liable for contract damages for actions taken in its sovereign capacity. *See also Tony Downs Food Co. v. United States*, 209 Ct.Cl. 31, 530 F.2d 367 (1976); *Air Terminal Services, Inc. v. United States*, 165 Ct.Cl. 525, 330 F.2d 974 (1964); *J.B. McCrary Co. v. United States*, 114 Ct.Cl. 12 (1949).

The court's function on a motion to dismiss for failure to state a claim upon which relief can be granted is to determine whether plaintiff's complaint is legally sufficient to support the claims it is asserting. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). At this stage of the proceedings, it is not clear, merely from the com-

plaint, whether the doctrine applies. The only allegation in the complaint to which defendant points as support for its extensive assertions of "sovereign" conduct are the brief references to President Reagan's directive. The directive is not attached to the complaint, nor are the subsequent documents implementing the policy.

Mere invocation of the sovereign act doctrine is not a talisman. The doctrine has limitations. As the Court of Claims expressed the principle in *Air Terminal Services, Inc.*, 165 Ct.Cl. at 536, 330 F.2d at 980, the Government must show that the actions were "public," "general," "sovereign," "performed for the public good," and not "arbitrary and unreasonable." It is also relevant whether the actions were purely economic in purpose (i.e., commercial). *See Perry v. United States*, 294 U.S. 330, 352, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935). The complaint and attachments are insufficient to resolve these questions.

In addition, it is arguable that if the actions "go too far," they can constitute a taking. *Air Terminal Services, Inc.*, 165 Ct.Cl. at 538, 330 F.2d at 981 (dissenting opinion of J. Jones). As the court held in *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934), "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state or the United States. Rights against the United States arising out of a contract with it are protected by the fifth amendment."

The court notes also that in defendant's reply brief, to which plaintiff had no opportunity to make a written response, it somewhat shifts its argument, pointing to cases [2] insulating certain governmental actions from judicial scrutiny because they involve political questions.

---

**2.** *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Chang v. United States*, 859 F.2d 893 (Fed.Cir.1988); *Belk v. United States*, 858 F.2d 706 (Fed.Cir.1988).

**3.** Defendant also sought dismissal on the ground that, even if the allegations were true, there was no breach of the terms of the agreements of either August 3, 1984 or December 6,

It is apparent that it would be premature, given the state of the record, to conclude that the actions complained of cannot give rise to liability under either a breach of contract or taking theory.[3]

### III. CONCLUSION

Count I of the complaint is dismissed. The motion to dismiss is denied in other respects.

---

1988. The court expressed its reservations concerning defendant's further contractual interpretation contentions during oral argument and they will not be repeated here. It is sufficient to say they were not, given the limited context, persuasive. They would benefit, along with the other arguments, from a fuller development through a summary judgment motion.