**AMERICAN SATELLITE COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 525–89C.**

United States Claims Court.

April 13, 1992.

Caryl A. Potter, III, Washington, D.C., with whom were Kenneth J. Wees, Mc-Lean, Va., Elizabeth A. Ferrell, and John J. Duffy, Washington, D.C., for plaintiff.

Peter G. Barber, with whom were Asst. Atty. Gen. Stuart M. Gerson, and David M. Cohen, Washington, D.C., for defendant. June W. Edwards, National Aeronautics and Space Admin., Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

Plaintiff, American Satellite Company, contends that the National Aeronautics and Space Administration ("NASA") was contractually bound to launch one of its satellites on the Shuttle, and that the actions of the President in the wake of the loss of the Shuttle Challenger unilaterally abrogated those rights in favor of other Shuttle customers. As a result, it claims that the United States is liable to it, either for breach of contract or for a constitutional taking, for the cost of reprocurement on a private launch vehicle, approximately $70 million. The case is before the court on cross-motions for summary judgment. For the reasons stated below, plaintiff's motion is denied and defendant's motion is granted.

## FACTUAL BACKGROUND [1]

On August 3, 1984, American Satellite Company ("ASC")[2] and the United States, represented by NASA, executed a Launch Services Agreement No. 1306–002 ("LSA"), under which NASA was to use its "best efforts" to launch two satellites owned by ASC aboard the Shuttle.[3] NASA's obligations under the LSA were to remain in effect until September 1995[4] or until both satellites were launched, whichever came first. The first satellite, ASC–1, was launched on the Shuttle on August 27, 1985. The second satellite, ASC–2, was scheduled to be launched on January 27, 1987.[5] On January 28, 1986, the Shuttle Challenger was destroyed in a fiery explosion shortly after take-off from the Kennedy Space Center at Cape Canaveral, Florida. As a result of the loss of the Challenger, the NASA Shuttle fleet was reduced from four Shuttles to three.

At the time of the Challenger accident, NASA had entered into LSAs obligating it to launch 44 other commercial payloads, including ASC–2. The payloads were listed on the Shuttle manifest in order of their "Planned" or "Firm Launch Date."[6] As of the date of the Challenger accident, ASC–2 was listed seventh on the manifest.

The aftermath of the accident saw a flurry of activity, particularly with regard to the commercial payloads. Rear Admiral Richard H. Truly, then the Associate Administrator of the Office of Space Flight at NASA, via letter dated April 17, 1986, apprised ASC of the status of NASA's effort to formulate a new manifest. In the letter, Admiral Truly stated that NASA was doing all it could to lessen the impact of the accident on the commercial users. To that end, Admiral Truly promised that the commercial payloads would "primarily be scheduled according to their launch sequence prior to the [Challenger] accident." NASA then sent another letter to ASC dated June 3, 1986, in which NASA told ASC that ASC–2 had been given a new launch date in December 1989.

But NASA's intentions were not to be fulfilled. After months of hearings, testimony and debate on the future of the Shuttle program, the President announced on August 15, 1986, that the United States was pulling out of the commercial launch business and that the Shuttle would no longer be used to launch commercial payloads. In the announcement, the President expressed his belief that the private sector would step forward and develop a satellite launch industry to fill the void left by NASA's departure from the business.[7]

The President's announcement left the Government with the problem of what to do with the 44 commercial payloads that

---

1. For a more detailed discussion of the circumstances surrounding NASA's entry into the commercial satellite launching business, as well as the events following the Challenger accident, see this court's decision in *Hughes Communications Galaxy, Inc. v. United States*, 26 Cl.Ct. 123 (1992), which is also issued today.

2. The plaintiff is now doing business under the name "Contel ASC."

3. The term "Shuttle" will be used throughout this opinion to denote the fleet of Shuttles.

4. The LSA provides that the period of performance runs until "the twelfth full United States Government fiscal year following the first operational Shuttle launch."

5. At the time of the signing of the LSA, ASC–2 was assigned a "Planned Launch Date" of October 13, 1986. The parties agree that NASA was within its powers under the LSA to reschedule ASC–2 to a "Firm Launch Date" of January 27, 1987.

6. The LSA defines "Planned Launch Date" as:

   the date, which initially defines the beginning of the interval during which launch is to occur, agreed to by the parties at the time of execution of the Agreement, at the time the Customer exercises a launch option given in this Agreement or at the time a Payload launch is rescheduled to occur greater than one year thereafter.

   ASC Launch Services Agreement, Art. XX, ¶ 21. "Firm Launch Date" is defined as:

   the date established on or about one year before the Planned Launch Date or at the time a Payload launch is rescheduled to occur within one year after the date of rescheduling. The original Firm Launch Date defines the beginning of the reduced interval during which launch is to occur.

   *Id.* ¶ 10.

7. See the decision in the companion case of *Hughes*, at 130–31, for the full text of the President's announcement.

were manifested as of the date of the Challenger accident. At a press conference also held on August 15, 1986, the President's press secretary, Larry Speakes, told reporters that a "working group" of the President's Economic Policy Council ("EPC")[8] would "set priorities among these 44" payloads and advise their owners as to when they might be launched. Press Briefing by Larry Speakes, et al., Aug. 15, 1986, at 2. Mr. Speakes would not be specific as to how the payloads would be prioritized, but he did suggest that special consideration would be given to those payloads that required a manned presence for deployment and those that had national security or foreign policy implications. *Id.* at 126.

On September 25, 1986, Alfred H. Kingon, the President's Cabinet Secretary, sent a memorandum to NASA's Administrator, Dr. James C. Fletcher, announcing the President's decision as to the future of the 44 commercial payloads. According to the memorandum, the President ordered that:

> NASA shall no longer provide launch services for commercial and foreign payloads subject to exceptions for payloads that: (1) are Shuttle-unique; or (2) have national security or foreign policy implications.
>
> ... NASA will revise its manifest to include only those payloads that are either Shuttle-unique or have national security and foreign policy implications. The manifest will then be made public, with the expectation that current customers who are not included on the manifest will voluntarily seek launch opportunities elsewhere.

"Shuttle-unique" is a term of art referring to a payload that is designed in such a way that it cannot be launched by any other method, such as aboard an unmanned expendable launch vehicle ("ELV"). Thus, those satellites having either national security or shuttle-unique status (or both) were excepted from the President's ban on commercial use of the Shuttle.

According to a document entitled "Space Shuttle Contracts, Forty Four Commercial/Foreign Payloads," prepared by NASA at the urging of the EPC,[9] five payloads had national security implications, twelve had foreign policy implications, and three were shuttle-unique.[10] Thus, only 20 of the 44 commercial payloads on the pre–Challenger manifest qualified for exceptions from the President's ban. Apparently, the White House hoped that the remaining 24 commercial payloads would be launched by the infant private ELV industry alluded to in (and essentially created by) the President's August 15, 1986 announcement. ASC–2 fell into this remaining class of 24 satellites having neither national security or shuttle-unique status.

On October 3, 1986, NASA issued a telegraphic message addressed to the "Commercial and Foreign Customers" of the Shuttle. The message announced the new manifest of commercial payloads for the Shuttle. The new manifest was comprised solely of those 20 payloads that met the criteria set forth in the President's order. ASC–2, though slated to be launched seventh on the pre-Challenger manifest, was not included on the new manifest. In fact, only two of the twenty payloads on the new manifest had previously held higher positions than ASC–2 on the pre-Challenger manifest. In effect, NASA, at the President's direction, reshuffled the

---

**8.** The Economic Policy Council was created by the President in 1985 to advise him on "national and international economic policy." Statement on the Creation of two Cabinet–Level Bodies, 1985 Pub. Papers 437 (Apr. 11, 1985). The council consisted of the "Secretaries of State, Treasury, Agriculture, Commerce, and Labor, the Director of the Office of Management and Budget, the United States Trade Representative, and the Chairman of the Council of Economic Advisers." *Id.* Mr. Speakes said at the press conference, however, that NASA, the National

Security Council, and the Department of Transportation were also represented in the "working group" of the EPC. Press Briefing by Larry Speakes, et al., Aug. 15, 1986, at 2.

**9.** See *Hughes,* at 131, for a discussion of this document.

**10.** Actually eight payloads were found to be shuttle-unique, but five of those eight also had either national security or foreign policy implications.

priorities of the 44 commercial payloads, paying very little heed to the pre-Challenger manifest.[11] As a result, several payloads originally having no priority over ASC-2 leapfrogged over and bumped ASC-2 off the Shuttle manifest.

By letter dated October 30, 1986, NASA's General Manager, Philip E. Culbertson, informed ASC that pursuant to current "White House policy," there was no launch date on the current manifest for ASC-2. The letter explained that the new manifest represented the Shuttle "launch schedule through calendar year 1994," and was necessary because "launch requirements ... far exceed current capacity." The letter went on to predict that: "[i]t appears almost certain you will not be provided launch services either prior to or after your current contract expires in September 1995."

ASC's LSA provides that if NASA delays a launch for more than nine months after the planned or firm launch date, ASC may terminate the LSA and receive a refund of its progress payments. By October 30, 1986, ASC's progress payments for the launch of ASC-2 totalled $8,994,844. In the October 30 letter, NASA advised ASC of the availability of this termination option.

ASC, however, chose not to terminate the LSA, but instead informed NASA by letter dated February 6, 1987, that it considered NASA's actions a "breach and final repudiation" of the LSA, and demanded that NASA return its progress payments. NASA returned the payments on April 10, 1987, pursuant to an agreement that neither party was terminating the LSA.

ASC was still hopeful of getting its remaining satellite on the Shuttle manifest. On December 6, 1988, NASA and ASC executed a document entitled an "Agreement," which provided that if ASC was able to secure the appropriate "governmental clearances" by January 31, 1989, i.e., the

conferral of "national security" status, then NASA would grant ASC-2 a new proposed launch date. It was expressly stated that neither party waived any rights it had under the LSA as a result of the promises contained in this document.

ASC's efforts to secure governmental clearance for ASC-2 prompted the following exchange of correspondence. First, ASC's request for national security certification was forwarded to Lieutenant General John T. Myers, the Director of the Defense Communications Agency. On January 17, 1989, General Myers wrote a memorandum to Gordon A. Smith, the Assistant Secretary of Defense, Office of Command, Control, Communications and Intelligence, which stated that ASC-2 would be "the only readily available domestic satellite" possessing certain encryption technology required for government communications pursuant to national security policy directives. Based on Gen. Myers' assertions, Mr. Smith sent a letter dated January 26, 1989, to Dr. Fletcher at NASA stating that Smith had "determined that the services to be provided by the ASC-2 satellite have national security implications. Therefore, NASA is authorized to process the ASC-2 satellite as involving national security interest when manifesting space shuttle payloads."

Unfortunately for ASC, Smith's determination alone was not enough to put ASC-2 on the Shuttle manifest. On February 21, 1989, Kenneth S. Pedersen, NASA's Associate Administrator for External Affairs, wrote Smith that he had been contacted by representatives of both the Office of International Security Policy and the Air Force. Those individuals told Pedersen that contrary to the statements in Smith's January 26, 1989 letter, "the issue of [ASC-2's] national security implications was still under review within the [Department of Defense ("DOD")] and that no final decision had been made." Pedersen informed Smith

---

**11.** The message stated, however, that: "Within the priority category foreign and commercial, the priority has been given to those payloads which are shuttle-unique and these which have national security and foreign policy considerations. These as a group, to the extent practicable have been manifested using the pre [Challenger] sequence as a guideline." The actual ordering of the payloads on this first post-Challenger manifest has no real relevance to this case since no matter how the chosen 20 were ranked, ASC-2 was left off the list.

that NASA could not change the priority determination of a satellite unless NASA was sure that the Defense Department was "explicitly recommending such a modification and that the position conveyed in your letter represents a formal agencywide DOD determination."

On June 22, 1989, the Under Secretary of Defense wrote to Admiral Truly, who by this time was the Acting NASA Administrator, to clarify the Defense Department's position. After a summary of the communications between the Department and NASA up to that point, the letter states:

> On behalf of the Secretary of Defense, I would like to affirm the DoD interest in the ASC–2, based upon the planned use of leased circuits and on this satellite's compliance with national policy concerning the protection of its command and control links. However, this should not be construed as DoD sponsoring a modification of the existing National Space Policy, or a reversal of the previous Presidential decision on the provision of launch services by NASA for commercial payloads that removed ASC–2 from the Shuttle manifest.

In other words, the Defense Department wanted to use ASC–2, but it was unwilling to go against the EPC's original classification of the satellite. Because NASA did not receive a clear directive from the Defense Department to reclassify ASC–2 as having national security implications, it did not add ASC–2 to the post-Challenger manifest.

On September 25, 1989, ASC filed the present complaint containing four counts. Count I was dismissed for failure to state a claim. *American Satellite Co. v. United States*, 20 Cl.Ct. 710 (1990).[12] Count II alleges that NASA breached the LSA provisions relating to rescheduling payloads in the event of launch delays. Count III alleges that NASA breached the December 6, 1988 agreement by not re-scheduling ASC–2 on the Shuttle manifest. Count IV alleg-

es that the President's actions in reprioritizing the commercial payloads amounted to a Fifth Amendment taking of ASC's rights under the LSA.

As of the date of this opinion, NASA has flown 21 successful Shuttle missions since the Challenger accident. However, only one of the twenty commercial payloads on the post-Challenger manifest, Hughes Communications' SYNCOM–IV–5, has been launched.[13]

### DISCUSSION

The issues raised by the three remaining counts have been expressed by ASC in the form of ten questions. Although the court does not find the form of these questions ideally suited to resolving the parties' contentions, matters can be simplified in that the first four are easily addressed.

The first two questions are related:

1. Under the United States Constitution, did the President have the authority to prohibit the Shuttle launch of satellites that allegedly did not meet the President's new launch priorities, even though the owners of those satellites had contracts with the United States for Shuttle launches?

2. Under the National Aeronautics and Space Administration Act, 42 U.S.C. § 2451 *et seq.*, did the President have the authority to prohibit the Shuttle launch of satellites that allegedly did not meet the President's new launch priorities, even though the owners of those satellites had contracts with the United States for Shuttle launches?

█ As fleshed out in its briefing, ASC contends that the President did not have the authority, either under the Constitution or by statute, to create a new classification scheme for the commercial payloads that gave priority to payloads that were either shuttle-unique or that had national security

---

12. In that opinion, we held that NASA did not breach its "best efforts" obligations by not launching ASC–2 on an ELV after the President decided that the Shuttle would no longer launch

commercial payloads. *American Satellite Co.*, 20 Cl.Ct. at 713–14.

13. The satellite was deployed by the Shuttle in January 1990.

implications.[14] Considered in isolation in this fashion, these questions are not properly before this court. As the Supreme Court suggested in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952), the proper forum for challenging the legality of Presidential action is through an action for injunctive relief in the district courts. Count IV of the complaint, seeking damages for a taking, is fundamentally inconsistent with plaintiff's preferred answer to both of the questions posed, i.e., the President's actions were unauthorized. As the Court pointed out in *Youngstown*, taking claims have been viewed as presuming *legitimate* government action. *Youngstown*, 343 U.S. at 585, 72 S.Ct. at 865.

Moreover, it was apparent from plaintiff's briefing and oral argument that the issue of authority was inextricably linked to the breach of contract discussion. ASC's real problem with the President's actions, as well as those of NASA, is that they vitiated the agreement. In other words, ASC contends that the President did not have the "authority" to exercise his powers in such a way as to abrogate the contract.

Defendant's motion, however, puts the underlying issues raised by these two questions in their proper perspective. That is, was the President acting as the "sovereign," for purposes of the sovereign act defense? The nature of the President's actions, and, by necessary inference, their legitimacy, will be discussed in that connection below.

The next two questions raise issues not properly before the court:

3. Even if the President had authority to prohibit the launch of satellites on the Shuttle notwithstanding the terms of Government contracts, was the exercise of such authority with respect to the ASC–2 satellite arbitrary and, therefore, a violation of the due process clause of the Fifth Amendment?

4. Even if the President had the authority to prohibit the launch of satellites that did not meet the President's new launch priorities, was the exercise of that authority unlawful for failure to satisfy the publication requirement of the Administrative Procedure Act, 5 U.S.C. § 552(a)(1)?

■ As to question three, it is well-settled that claims based exclusively on violations of the due process clause are not remediable in this court. The due process clause is not money-mandating within the meaning of the Tucker Act.[15] *Alabama Hospital Ass'n v. United States*, 656 F.2d 606, 609, 228 Ct.Cl. 176, 180 (1981), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). The plaintiff's argument is only justiciable in this court to the extent that it is necessary but subordinate to a claim under the Tucker Act. In the context of this action, a claim of a lack of due process only makes sense as an explanation for why the Government's conduct constituted a breach of contract. It will therefore be taken up in that context only.

■ The fourth question, also, is an inappropriate one in this court. The court does not have jurisdiction to review Government actions for compliance with the Administrative Procedure Act, in the absence of some other source of jurisdiction, such as a claim that a "money-mandating" statute or regulation, properly applied, requires payment to be made. *See National Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1559 (Fed. Cir.1988); *Florida Rock Indus., Inc. v.*

---

**14.** Under the new classification scheme, four commercial payloads were given priority over ASC–2 because they met the national security exception. Those four payloads, RCA 4005 and Geostar–1, 2, and 3, were ranked 25, 42, 43, and 44 respectively, on the pre–Challenger manifest. Three commercial payloads, SII–1, 2, and 3, owned by Space Industries, Inc., were classified shuttle-unique and given priority over ASC–2. On the pre-Challenger manifest, the SII payloads occupied slots 39, 40, and 41. ASC does not contest the inclusion on the post-Challenger manifest of the 12 commercial payloads found to have foreign policy implications, i.e., those owned by foreign governments, because those 12 were among the first 20 on the pre-Challenger manifest anyway. Therefore, ASC's motion does not focus on the authority of the President to grant priority to commercial payloads having foreign policy implications.

**15.** 28 U.S.C. § 1491(a)(1) (1988).

*United States*, 791 F.2d 893, 899 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1375 (Fed.Cir.1983). Once again, defendant properly characterizes the inquiry as the degree to which, in the context of a breach of contract allegation in which the sovereign act defense is raised, the court can scrutinize actions and motives of the President and of executive agents.

The remaining six questions properly address the remaining issues in this court, namely, whether there was a breach of contract, and if not, whether there was a taking. They will be discussed in that context.

*Validity of the President's Policy Directive*

■ For reasons explained in the *Hughes* opinion, but which are applicable here, the court holds that the LSA between ASC and the United States, albeit unusual, was nevertheless a valid, binding contract. The initial question is therefore whether the Government's actions in informing ASC that its second satellite would not be launched were a breach of that contract. As in *Hughes*, the real inquiry, at least as to the LSA itself, is whether the agreement contemplated that, under circumstances in which there was a change of launch policy, there would be no contract liability. As the court holds in the companion case, Article XV contemplated compliance not only with law and policy extant at the time of the LSA, but also that "the parties' obligations would continually be adapted to changing law and policy." *Hughes*, at 139–40. Article XV of the LSA is, for all practical purposes, an incorporation into the agreement of the sovereign act defense. Such a reading of Article XV does not void the contract because of the Government's implied promise to act in good faith and only change space policy when it determines, acting as sovereign, that it is necessary to do so.

The sovereign act defense presumes a dichotomy in the roles with which Government can act, even with respect to a single activity. It can act in a sovereign, i.e., "governing," capacity, or it can function in a commercial sense as a consumer or producer. Fundamentally, the dispute in this case turns on whether the President was acting in his governing capacity, or in fact as chief merchant on behalf of the biggest player in a marketplace. The question is not trivial. Given both the federal government's preeminent position as a governing institution in our democracy, as well as the enormity of its impact in terms of buying and selling goods and services, the risk is great that, under the guise of governing, it could unfairly influence market phenomena to its own advantage. On the other hand, those who traffic with government cannot be better insulated than other businesses from the unfortunate fallout of legitimate actions of the sovereign. The capacity of the sovereign to govern cannot be contracted away.

The defense is thus not without limits. The traditional test has been expressed in terms of whether the acts in question were public and general, not commercial in purpose, and not arbitrary. *American Satellite*, 20 Cl.Ct. at 715. Although not expressed in those terms, ASC's initial argument, that the President's acts were unauthorized, is not irrelevant to this inquiry. The available sources of the President's power to act, as well as the relationship between the President's authority versus that of Congress shed a great deal of light on whether the President was in fact acting on behalf of the Government in its sovereign capacity.

■ At the outset, it has to be observed that there is an inherent contradiction in ASC's challenge to the President's authority to act. On the one hand, ASC places its complete reliance on the 1982 policy statement.[16] Presumably this directive, incorpo-

16. Article IV, paragraph 1.a. of the LSA, entitled "Launch Scheduling Policy and Procedures," provides:

  With respect to launch priority and scheduling, NASA will provide Launch and Associat-

ed Services in accordance with the United States policy governing launch assistance approved by the President of the United States on August 6, 1982. Consistent with this poli-

rated into the contract, was not *ultra vires.* When the President in effect revisited that policy in 1986, however, ASC contends the change was illegal.

Contrary to plaintiff's position, the very existence of an earlier policy directive highlights the propriety of the President's actions. The Supreme Court's decision in *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), is instructive in this regard:

> As Justice Frankfurter pointed out in *Youngstown,* 343 U.S. at 610–611, 72 S.Ct. at 897–98, "a systematic, unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned ... may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II." Past practice does not, by itself, create power, but "long-continued practice known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent...." *United States v. Midwest Oil Co.,* 236 U.S. 459, 474, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915).

*Dames & Moore,* 453 U.S. at 686, 101 S.Ct. at 2990 (alteration in original). As in *Dames & Moore,* Congress has acquiesced to a consistent pattern of Presidential policy-making for the nation's space program. Moreover, that policy-making role has explicit constitutional and statutory legitimacy.

To begin with, there can be no real question that, at least during the 1980s, the uses of the Shuttle were impressed with national security and foreign policy implications and indeed, uses. Leadership in matters of foreign affairs and national military security are expressly entrusted to the President by Article II of the Constitution.

Additionally, the 1958 act creating NASA provided that the NASA Administrator was to perform his duties "[u]nder the supervi-

sion and direction of the President." 42 U.S.C. § 2472(a) (1958). Since the same statute grants NASA broad powers over the nation's space program, the President certainly was given colorable power to shape national space policy.

■ The history of the space program clearly demonstrates that it is the President who has initiated policy directives with respect to the nation's impulse to explore space. Many of those initiatives have subsequently been followed by Congressional concurrence. It was the President who first decided in 1972 that the Shuttle should be used for commercial purposes. *See generally Hughes,* at 126. The Congressional statement that the Shuttle "should serve commercial users" did not appear until 1985. In fact, the primary source of new United States' space policy has been the White House. *Id.*

The Commercial Space Launch Act, Pub.L. No. 98–575, 98 Stat. 3055 (1984) (codified as amended at 49 U.S.C. app. §§ 2601–2623 (1990)), enacted October 30, 1984, echoes Executive Order No. 12,465, 49 Fed.Reg. 7211, issued February 24, 1984, which designated the Department of Transportation as the "lead agency for encouraging and facilitating commercial ELV activities by the United States private sector." The first sentence of the Executive Order asserts the President's authority to set the nation's space policy:

> By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to encourage, facilitate and coordinate the development of commercial expendable launch vehicle (ELV) operations by private United States enterprises, it is hereby ordered as follows: ...

The "Congressional Findings" section of the subsequent statute provided, in relevant part, that:

cy, NASA will generally treat all commercial/foreign payloads on a comparable basis. The United States policy referred to in this provision stated:

> Each launching will be treated in terms of its own requirements and as an individual case. Once a payload is scheduled for launch, NASA

will use its best efforts to meet the scheduling commitments. Should events arise which require rescheduling, NASA will consult with all affected users in an attempt to meet the needs of the users in an equitable manner.

United States Launch Policy, Aug. 6, 1982, Complaint Exh. 3.

(4) the private sector in the United States has the capability of developing and providing private satellite launching and associated services that would complement the launching and associated services now available from the United States Government;

(5) the development of commercial launch vehicles and associated services would enable the United States to retain its competitive position internationally, thereby contributing to the national interest and well-being of the United States.

(6) provision of launch services by the private sector is consistent with the national security interests and foreign policy interests of the United States and would be facilitated by stable, minimal, and appropriate regulatory guidelines that are fairly and expeditiously applied;

(7) the United States should encourage private sector launches and associated services and, only to the extent necessary, regulate such launches and services in order to ensure compliance with international obligations of the United States and to protect the public health and safety, safety of property, and national security interests and foreign policy interests of the United States.

49 U.S.C. app. § 2601 (1984). Both the Executive Order and the subsequent statute thus express a policy of encouraging commercial expendable launch activities.

Another instance of Congressional concurrence in Presidential policy-making occurred when Congress enacted 42 U.S.C. §§ 2466a–2466c on December 5, 1985, essentially duplicating the pricing policy originally set by the President in a National Security Decision Directive issued July 30, 1985. Both the statute and the President's directive set the price for the use of the entire Shuttle cargo bay at $74 million. Other sentiments from the President's directive also were duplicated in the later enacted statute. For example, the President's directive stated: "NASA will review annually Shuttle cost experience and the anticipated effectiveness of the this pricing policy in implementing National Space Policy goals under changing market condi-

tions." National Security Decision Directive No. 181. The statute provides: "Each year the Administrator shall submit to [Congress] a report ... which shall inform the Congress how the policy goals contained in [this section] are being furthered by the Shuttle price for foreign and commercial customers." 42 U.S.C. § 2466c(b) (1986).

The very policy change at issue, the President's September 25, 1986 directive, was expressly iterated by Congress in the Launch Services Purchase Act of 1990:

> Commercial payloads may not be accepted for launch as primary payloads on the space shuttle unless the Administrator of [NASA] determines that—
>
> (1) the payload requires the unique capabilities of the space shuttle; or
>
> (2) Launching of the payload on the space shuttle is important for either national security or foreign policy purposes.

42 U.S.C.A. § 2465f(a) (West Supp.1991).

As part of the same Public Law that included the Launch Services Purchase Act, Congress enacted the NASA Authorization Act for Fiscal Year 1991. ASC cites section 112 of the Authorization Act, codified at 42 U.S.C.A. § 2465a (West Supp.1991), and entitled "Space Shuttle use policy," as illustrative of the superior role of Congress in the formulation of space policy. ASC claims that this provision contradicts the President's 1986 policy by allowing commercial payloads to be launched as "secondary payloads." But an examination of the entire text of that section reveals that ASC's reliance is misplaced. The portion of that section concerning the use of the Shuttle provides:

> (1) It shall be the policy of the United States to use the Space Shuttle for purposes that (i) require the presence of man, (ii) require the unique capabilities of the Space Shuttle or (iii) when other compelling circumstances exist.
>
> (2) The term "compelling circumstances" includes, but is not limited to, occasions when the Administrator determines, in consultation with the Secretary of De-

fense and the Secretary of State, that important national security and foreign policy interests would be served by a Shuttle launch.

(3) The policy stated in subsection (a)(1) of this section [above] shall not preclude the use of available cargo space, on a Space Shuttle mission otherwise consistent with the policy described under subsection (a)(1) of this section, for the purpose of carrying secondary payloads (as defined by the Administrator) that do not require the presence of man if such payloads are consistent with the requirements of research, development, demonstration, scientific, commercial, and educational programs authorized by the Administrator.

42 U.S.C.A. § 2465a(a) (West Supp.1991).

Paragraphs (1) and (2) plainly are restatements of the policy that the Shuttle will be used for shuttle-unique payloads and those having national security or foreign policy implications. ASC attempts to find relief in the mention in paragraph (3) that the Shuttle may accommodate secondary payloads that are commercial in nature. The record is silent on what constitutes a "secondary payload." There is no reason, however, for the court to conclude that the President's September 1986 directive is inconsistent with the more recent statute. There is nothing in the legislation, or the materials surrounding its .adoption that suggests Congress viewed section 112 as a limitation on the President's 1986 policy statement. In any event, ASC does not contend that ASC–2 would qualify as a secondary payload within the meaning of the statute.

ASC also points to the "findings and declaration of purpose" section of the NASA Authorization Act of 1986,[17] enacted December 5, 1985, to support the proposition that the President's directive thwarted the will of Congress. Congress there recites that "[t]he Space Transportation System [of which the Shuttle is a part] contrib-

utes to the expansion of United States private sector investment and involvement in space and therefore should serve commercial users." 42 U.S.C. § 2466(3) (1985).[18] But ASC ignores the separate policy concern of both the President and Congress that a private ELV industry be promoted. See discussion of Exec. Order No. 12,465 and 49 U.S.C. app. §§ 2601–2623 *supra* pp. 154–55.

In fact, the creation of the shuttle-unique exception highlights one of the reasons the President gave for his decision, the desire to spur the growth of a domestic ELV industry. The Commercial Space Launch Act shows that the furtherance of this goal was not only within the authority of the President, but was also an expressly stated Congressional policy. By removing NASA as a competitor for commercial satellites, the President instantly created a market for the private ELV industry. Shuttle-unique payloads would by definition not be in that market, since those payloads could not be launched aboard an ELV.

The President was thus implementing two expressions of Congressional intent. On the one hand, the Shuttle was to serve commercial users. On the other hand, the Government was to encourage private ELV launches. By removing from the Shuttle manifest those satellites that could be launched aboard an ELV, and allowing the shuttle-unique payloads to remain, the President was acting to advance two express Congressional goals.

ASC has been unable to cite a single instance of Congressional action that in any way limits the President's authority to set space policy. ASC's reference to H.R. 5495, a bill passed by both houses of Congress but pocket vetoed by the President in November 1986, is inapposite on this point. ASC argues that the bill would have in effect overturned the President's September 25, 1986 directive by instructing NASA to develop a manifest that would honor the

17. Pub.L.No. 99–170, 99 Stat. 1017 (codified at 42 U.S.C. § 2466 (1985) ).

18. The language of this section is identical to that used by the President seven years earlier in

a document entitled "United States Space Activities, Announcement of Administration Review." 14 Weekly Comp.Pres.Doc. 1135, 1136–37 (June 20, 1978).

outstanding LSAs of all the commercial users. The Committee report accompanying the bill stated that "[t]he Committee also feels that NASA should make every attempt to ensure that all existing contracts with launch customers are honored." H.Rep. No. 829, 99th Cong., 2d Sess. 24. Thus, ASC argues, Congress was expressing its opposition to the President's action by passing H.R. 5495.

While it is true that this bill does appear to be at odds with the President's action, nowhere in the text or legislative history of H.R. 5495 is there any mention that the President overstepped the bounds of his authority. Congressional disagreement with a Presidential policy change does not mean that the policy change was unauthorized. In any event, the veto was sustained.

■ In sum, there has been a systematic practice of Presidential initiative in the area of the nation's space policy. This role is consistent with the President's powers under Article II of the Constitution, and has been tacitly, if not expressly, acknowledged by Congress. The court should approach with circumspection the issue of whether the President has exceeded the permissible limits of his statutory or constitutional authority. Given the absence of any contravening legislation, the court declines to question the enforceability of the 1986 policy change. The separation of powers explicit in the Constitution breaks down if the courts do not exercise restraint in examining the authority of the executive to act. For reasons set forth in *Hughes*, the court concludes that this change in policy, brought into the contract as a substituted term through Article XV, was binding on the parties. *Hughes*, at 134–35. Reprioritization within the commercial payloads was therefore not an anticipatory breach by NASA of the LSA.

### Application of the new policy

■ In anticipation of this holding, ASC contends that even under the post–1986 regime, it should have been afforded an early launch slot on the new manifest. It argues that the new priority categories were arbitrarily and unreasonably applied by the EPC. ASC does not argue that the EPC's judgment was wrong as a matter of law,[19] or that it violates the terms of applicable regulations. The substance of plaintiff's argument is simply that it disagrees with the EPC's assessment that ASC–2 did not have national security implications. As we note in *Hughes*, the motives, reasoning, and fact-finding of a cabinet-level body are

19. At oral argument, ASC did contend that the policy to cease launching commercial satellites was not "published" within the meaning of the terms of the LSA. Counsel argued that:

> the September 25, 1986 directive, which everybody's talking about as policy, isn't published.... That document first surfaced in 1983, during ADR [alternative dispute resolution] proceedings under a protective order agreed to by the parties, and then it went back to NASA....
> Now, this is hardly published policy in 1986. Published policy is in the U.S.Code, and the CFR.

Transcript of Oral Argument, Jan. 7, 1992, at 76–77. ASC has cited no decisions to support that position. There are decisions tending the other way. *See, e.g., ConnAire, Inc. v. Secretary, United States Dep't of Transp.*, 887 F.2d 723, 728 (6th Cir.1989) (Federal Aviation Administration's internal guidelines considered its published policies); *Estate of Bender v. C.I.R.*, 827 F.2d 884, 887 (3d Cir.1987) (internal manual of the Internal Revenue Service called the "published policy of the IRS"); *Kunda v. Muhlenberg College*, 621 F.2d 532, 545–55 n. 5 (3d Cir.1980) (faculty handbook considered published policy of college for the purpose of establishing procedures for tenure).

The LSA does not define the term "published policy." The generally accepted meaning of the term "publish" is "to make generally known," "to make public announcement of," or "to place before the public." Webster's Ninth New Collegiate Dictionary (1986). Even if the President's September 25, 1986 directive does not meet this definition, the October 3, 1986 telex surely does. That telex, sent to all commercial and foreign customers, sets out the new policy stating that: "[w]ithin the priority category foreign and commercial, the priority has been given to those payloads which are shuttle-unique and these which have national security and foreign policy considerations." The telex concludes by stating that NASA "sincerely regrets the agonies of the past several months caused by the schedule and policy uncertainties and look forward to a time of renewed commitment and stability." Clearly, the purpose of the telex was "to make generally known," i.e., to publish, the new Shuttle policy relating to commercial payloads.

rarely subject to judicial scrutiny, and the court declines to do so in this case. *Hughes*, at 141–43. It is hard to imagine an executive decision that is less appropriate for judicial oversight than the decision of whether to classify the competing payloads as implicating national security. *See Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952). The court would be well off its leash.

*Was the follow-up agreement breached?*

■■■ Unlike Hughes, after it became apparent that its remaining payload would not be launched, ASC negotiated a new agreement in December 1988. By its terms, NASA promised to provide ASC–2 with a new launch date if ASC succeeded in having the Department of Defense reclassify ASC–2 as having national security implications. The reclassification had to occur by January 31, 1989. ASC claims that it fulfilled its end of the bargain when the Assistant Secretary of Defense, Mr. Smith, sent the letter to NASA purporting to authorize NASA to "process the ASC–2 satellite as involving national security interest when manifesting space shuttle payloads."

It is apparent, however, from the subsequent communications between the Department of Defense and NASA that Mr. Smith's authorization was in effect repudiated. The later correspondence made it clear that the Department was not prepared to challenge the EPC's determination as to the classification to be afforded each payload. Even assuming that the December 1988 agreement involved an exchange of new consideration, it expired by its own terms when on January 31, 1989, NASA had still not been authorized to reschedule ASC–2.

*Was there a taking?*

■■■ It follows that ASC's takings claim must fail.[20] Plaintiff certainly had a prop-

erty interest in its contract rights under the LSA. Insofar as is relevant here, its rights were to insist on prioritization pursuant to contract terms. Absent the allowed-for possibility of a change in policy, NASA could not arbitrarily reassign ASC's slot to another commercial user. ASC cannot, however, assert a property interest that is larger than those contract rights. Because the possibility of a change in governing policy was built into the LSA in Article XV and other places, no property of plaintiff's was taken when NASA implemented the instructions of the President. Ever present was the possibility, contemplated by the LSA, that United States space policy would change, rendering performance by NASA impossible. *See Hughes*, at 140. Nevertheless, the result would be the same even if the sovereign act defense were not brought directly into the contract.

As this court and its predecessor court have held, the takings clause has limited application in a contract context. *See J.J. Henry Co. v. United States*, 188 Ct.Cl. 39, 46, 411 F.2d 1246, 1249 (1969); *Consolidation Coal Co. v. United States*, 60 Ct.Cl. 608 (1925); *Marathon Oil Co. v. United States*, 16 Cl.Ct. 332, 338–39 (1989). The Court of Claims held in *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786 (1978):

> It is established that not every deprivation of use, possession or control of property is a taking. One must look to the character and extent of any interference with property rights whenever a taking claim is asserted. More importantly, the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract.

*Sun Oil Co.*, 215 Ct.Cl. at 769, 572 F.2d at 818 (citations omitted).

Similar reasoning has been applied by the Supreme Court when faced with claims that contract rights were abrogated by sub-

---

**20.** In the earlier decision in this action, the court held open the possibility that, even if the sovereign act defense is properly invoked as a defense to a contract action, the action may nevertheless be subject to a takings analysis. *American Satellite*, 20 Cl.Ct. at 715. Having found that the contract itself incorporates the substance of the defense, however, plaintiff cannot prove the requisite property interest.

sequent legislation. In *F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), plaintiff operated an apartment complex for which the mortgage was insured by the Government pursuant to the National Housing Act.[21] The issue was whether the act, as originally drafted, and as amended after construction of the apartment building, permitted leasing to transients. Plaintiff argued that the original legislation did not, but that the amendment did, thereby breaching a contract right. The Court held that the statute had always barred rentals to transients, but more broadly, concluded that the mortgagor had no contract right to assume the contrary: "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."

In *The Darlington*, the Court found that the initial legislation was too unclear to form the basis for a protectible property interest. In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), the result was the same, but the plaintiff state agencies were able to point to much clearer expressions of Congressional intent. In that case, the court below found that changes in the Social Security laws effected a taking of property by preventing states from withdrawing from the Social Security System. All fifty states had opted into the system at a time when the applicable legislation permitted individual state agencies to withdraw upon two years' notice. 42 U.S.C. § 418(a)(1) (1982 & Supp. III 1985). Agreements had been executed pursuant to this section, specifically incorporating the right to withdraw. Subsequently, Congress repealed the termination provision, and the plaintiff agencies were barred from ending their participation. They contended that the original legislation created rights, confirmed by the agreements, which could not be subsequently terminated, or if they were, required compensation. The Court disagreed. While not denying that the agree-

ments were contracts, it held that the termination options were "part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare." *Public Agencies*, 477 U.S. at 55, 106 S.Ct. at 2398. The contract had to be construed as subject to the over-arching power of the sovereign to rule: "[W]e have emphasized that 'without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'" *Id.* at 52, 106 S.Ct. at 2396.

Having eviscerated the contract provision of effect, it followed that there was no taking: "[T]he 'contractual right' at issue in this case bears little, if any, resemblance to rights held to constitute 'property' within the meaning of the Fifth Amendment.... The provision simply cannot be viewed as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation." *Id.* at 55, 106 S.Ct. at 2398.

To similar effect is *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). There, the petitioners were trustees of a private pension fund. The agreement creating the fund limited the liability of the participating employers. In adopting the Multiemployer Pension Plan Amendments Act ("MPPAA") of 1980, Pub.L. No. 96–364, 94 Stat. 1208 (codified as amended at 29 U.S.C. §§ 1381–1461 (1988)), Congress imposed additional financial obligations on those employers, the net effect of which were to benefit private pensioners. Although the Court conceded that the legislation effected a rewriting of the private contracts, it held there was no taking: "In this case, the United States under the MPPAA has taken nothing for its own use and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within

---

**21.** Pub.L. No. 559, 56 Stat. 303 (codified at 12 U.S.C. § 1743 (1942)).

the power of Congress to impose." *Connolly*, 475 U.S. at 212, 106 S.Ct. at 1019. The Court found, moreover, that petitioners were on notice that pension plans were the object of legislative concern and regulation. *Id.* at 226–27, 106 S.Ct. at 1026–27.

These decisions of the Supreme Court dealt with the power of Congress to regulate. It is plain, however, that the same result should obtain when the President acts in his sovereign capacity. In *Chang v. United States*, 859 F.2d 893 (Fed.Cir.1988), the court was faced with a claim by private contractors that executive orders issued by President Reagan had effected a taking of their contracts with the Libyan government. The orders, which embargoed Libya and forbad Americans from doing business there, certainly destroyed their contracts. It was sufficient to sustain the trial judge's denial of relief for the Federal Circuit to address two of the three indicia of a regulatory taking set out in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (the nature of the government action and the degree of interference with investment-backed expectations; the third element is economic impact). The court held that the nature of the government's action did not partake of a traditional taking. The executive order "took" nothing for public use. There was no appropriation. Moreover, the plaintiffs had no legitimate expectation, given the foreign policy implications of the contracts, that their commercial interests were immune from the fallout of deteriorating relations between the United States and Libya, a circumstance of which they should have been aware. *Chang*, 859 F.2d at 897; *see also Atlas Corp. v. United States*, 895 F.2d 745, 758 (Fed.Cir.1990) (holding plaintiff had no reasonable investment-backed expectation

that it would not be required to remediate health and environmental hazards resulting from its production of uranium).

■■■■ These decisions dictate the result here. Given the propensity of the President and Congress to use the Shuttle as a tool of national space policy, and to implement the country's economic, security, and foreign interests, it would have been an exercise in blind optimism for the plaintiff to assume that space policy would remain static. *See California Hous. Sec., Inc. v. United States*, 959 F.2d 955, 958 (Fed.Cir.1992); *Atlas Corp.*, 895 F.2d at 758. That it should have been aware of this possibility is highlighted by Article XV and other provisions of the LSA. Moreover, as in *Connolly* and *Chang*, the Government did not seize the launch slots for itself (beyond the priority it had always maintained), but reshuffled them between commercial users.[22] ASC's expectations were backed by capital investment, but those investments were retrievable. If ASC forewent the opportunity to contract earlier for another launch medium, it becomes apparent that what ASC lost was not property taken for public use, but the payoff on a calculated business risk. Unlike the plaintiffs in *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169 (Fed.Cir. 1991), ASC has not been prevented from achieving its objective, i.e., to launch its satellite. Instead, it must resort to alternative, albeit more expensive, purveyors. This circumstance does not rise to the level of a Fifth Amendment taking.

### CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judg-

---

**22.** This is not to suggest that the Government can simply redistribute wealth at its unfettered instance, or that such redistribution might not implicate a public use. Rather, as the Court held in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), not all Government regulation constitutes a taking. Only those that go "too far." *Pennsylvania Coal*, 260 U.S. at 413, 43 S.Ct. at 159. In determining whether the regulation goes too far, it is rele-

vant to consider the character of the Government action. *Accord Yee v. City of Escondido*, —— U.S. ——, ——, 112 S.Ct. 1522, 1528, 118 L.Ed.2d 153 (U.S.1992). In other words, physical invasions or expropriation are more likely to require compensation than the effects of routine programs regulating the social or economic life of the country as a whole. *See Atlas Corp.*, 895 F.2d at 756.

ment is granted. The Clerk is directed to dismiss the complaint. No costs.